The Chief Justice

delivered the Opinion of the Court.
William Taylor, who died intestate, in 1835, being the owner of an extensive estate in lands, settled his children, when they married, each upon a separate tract. Thomas T. Barber and wife, who was one of Taylor’s daughters, were placed, in 1814, shortly after their marriage, on a tract of about one thousand acres, under a verbal assurance that Taylor would convey the legal title to Barber. They lived on the land until Mrs. Barber’s death, in January, 1833; and in June of the same year, Taylor conveyed to Barber the legal title to the land—reciting in the deed, that it was to be understood “that he conveyed the land as a part of the portion” he had given to Barber with his (Taylor’s) daughter. But he died without giving any written memorial of advancement to any of his other children; and consequently, the lands he had allotted to them respectively, descended to all his heirs, as a common fund for partition.
Shortly after the death of Taylor, his widow and two infant children filed a bill in Chancery for partition, which was accordingly made. The Court allotted to each of the children, who had been settled by Taylor on his land, without any written evidence of gift, the tract which each had occupied, estimated at the time of partition, without regard to improvements which had been made by the occupants respectively; but, considering the land conveyed to T. T. Barber, as an advancement to his wife and her children—the Court charged those children with its value, estimated at the date of the conveyance, in June, 1833. And there being, in our opinion, no other matter deserving particular notice, so much of the decree only as affects the children of T. T. Barber, will now be *85 considered, on this writ of error, prosecuted by them and others, to reverse it.
The provisions of the statutes concerning advancements and hotchpot, stated.
Leading English cases, upon advancements, cited, and the governing principles—that the Court should endeavor to give effect to the intention of the father, and produce equality among the children, &c.—approved.
First. The seventeenth section of an act of 1796, copied from the fifteenth section of an act of Virginia of 1785, "directing the course of descents”—provides, "that where any ‘‘children of the intestate or their issue shall have recei “ved from the intestate in his life time, any real estate ‘‘by way of advancement, and shall choose to come into “partition with the other parceners, such advancement “shall be brought into hotchpot with the estate deseen“ded.”
The twenty eighth section of an act of 1797, concerning the distribution of the personal estates of intestates, contains substantially the same provision as to advancements in such estates.
And an act of 1830 confounds all distinctions previously made in classes of property, so far as hotchpot maybe concerned, and requires all advancements to be estimated at their value when made.
Excepting as to the prescribed period of valuation, the foregoing enactments are substantially like the fifth section of “the statute of distributions” enacted in England in the 22 and 23 Car. 2, c. 10; and therefore, the judicial interpretation of the latter, established when the former were enacted, should be deemed equally applicable to them also.
In Edwards vs Freeman, (2 Pr. Wms. 435,—and which is the leading case on the subject—it was decided that, in determining all questions concerning advancements, the object and intention of the father who gave, are to be chiefly considered; that a provision to take effect after the death of the father, or in reversion, or even contingently, whenever it can be deemed of value, may be considered an advancement pro tanto; that equality was the great object of the statute, which should, therefore, be considered as “a parliamentary will;” and consequently, that a settlement secured, before marriage and in consideration thereof, upon a then unborn first daughter of the party making it, should, after his death, intestate, be deemed an advancement which should be brought into hotchpot.
*86 And in Wayland vs Wayland (2 Atk. 635,) Lord Hardwick decided that, a settlement upon a son for life, remainder to his wife, and then to his children, should be considered an advancement to the son, to the whole extent of the value of the entire estate, even though he had received only a life estate, and his wife, a stranger in blood to his father, was, by the terms of the gift, entitled, contingently, to a life estate in remainder.
These doctrines seem to us to be as just and reasonable as they are undoubtedly authoritative. They virtually recognize, as a controlling principle, the intestate father’s intention; and therefore, virtually decide that, whatever he intended as an advancement and would have so treated at his death, should generally, if not invariably, be so considered, without regard to the mode of making or of securing the actual enjoyment of it—concerning all which he should be the sole arbiter. And therefore, there could be no doubt that, if a father should vest in a stranger the title to property, in trust for a daughter, the estate, thus intended for her by such a provision, should generally be deemed an advancement, even though, by the mal-conduct of the trustee, she had lost the whole benefit of the provision.
A gift of money or other personal property to the husband of the donor’s daughter, would, if not otherwise intended, be an advancement to such daughter, though the husband, by wasting or losing it, might prevent his wife from deriving any benefit from it. So land given in frank marriage to the husband and wife and to the survivor of them and their issue in tail—the wife being the daughter of the giver—would be an advancement to her, to the full extent of the value of the entire estate, although the husband might survive her, and might also dock the entail, and thereby monopolize the whole estate: yet, in distributing her intestate father’s estate, her children would be charged with the value of the estate thus enjoyed and converted by their father, because their grand father so intended and provided, and because the object of the statute was to distribute his estate as he himself would have done, or may be presumed to have intended.
*87 Nor could we doubt that a conveyance of land to the husband of the conveyor’s daughter, in consideration only of his being her husband, should be considered an advancement to her, just as much as if the conveyance had been to herself alone, or to her and her husband as tenants of the entirety.
Then, had William Taylor made the conveyance to Barber immediately after his marriage, or at any time during his wife’s life, there could, we suppose, have been no doubt that the land so conveyed would have been an advancement to Mrs. Barber, even though she never had any title to, or control over, the land or its profits.
And should not the conveyance, as made in this case, have precisely the same effect? We think so. It was evidently so intended; and as evidently, effected all the ends which would have been accomplished by an earlier; conveyance in the same mode. Had Taylor made a written, instead of a merely oral, promise to Barber and his wife, to convey the land to him alone, the fact that the conveyance was not made to him until after her death, would have been entitled to no consideration on the question of advancement. Then why should the immaterial circumstance, that the promise was legally voidable by Taylor, have any effect, when he not only never revoked the gift, but made it irrevocable, and literally fulfilled his promise, to the full extent of its purpose and practical benefits?
He intended to provide for his daughter and her children by giving the land to her husband and their father; and he effectually accomplished that end. She enjoyed, during her life, the use of the land as much as she could have done had the legal title been conveyed to her husband on their marriage; perhaps she enjoyed more of the use of it than she might have enjoyed had her husband possessed legal power to sell the land. Indeed, it is altogether probable that her father intended, by the non-execution of the conveyance, during the joint lives of herself and husband, thus to secure to her a beneficial use which a conveyance to her husband, in her life-time, or even a conveyance to herself alone, or to both of them, could not have secured to her; because, any such *88 conveyance might have enabled the husband, instead of the provident father, and against his will, to have controlled the use and disposed even of the fee.
The value of an advancement at the time when it is made, is (by the act of 1830,) the value at which it is to he brought in hotchpot. But where a father advances a child by a verbal gift of land—which could not be enforced, and might be revoked—but is afterwards confirmed by a conveyance, the value of the land at the date of the conveyance, is the value at which it is to be brought into hotchpot.
Every advancement should be charged at its value at the time when the gift became complete, and irrevocable, in law or in equity.
*88 It is not material to enquire whether the fee should be deemed an advancement to Mrs. Barber, or to her children, or to all of them in succession. Her children only represent her, and can be entitled to no more than she would be entitled to were she now living; and if she were yet alive, we could not doubt that she would be justly and legally chargeable with the land conveyed to her husband, as so much received by her from her father, in the manner deemed best for her by him. He intended, as should be presumed, to provide for her and her children, by securing to her the use of the land during her life, and by conveying the title to her children’s father, which he considered the best mode of providing for all of them. And he intended, as we should also presume, that she and they, as her representatives, should, in the partition of his estate after his death, be charged with that land as so much advanced by him for their benefit.
Such, as we think, is the statutory will. The recital in the deed to Barber shows expressly that the land was conveyed by Taylor, as a part of that portion which he intended for his daughter, the wife of Barber.
Second. Could the advancement be considered as complete and irrevocable from the moment of the verbal gift of the land, the statute of 1830 would fix the year 1814 as the time for estimating the value of it. But it was not then complete and irrevocable. It was revocable and initiate only, until the conveyance made it irrevocable and consummate. Had the land, become greatly depreciated, it would be unreasonable to charge it in the partition at its greater value in 1814, because, as the gift of it was revocable by the donor until 1833, the donees had not the legal or equitable means of availing themselves of that greater value by sale or otherwise. And doubtless, Taylor himself intended that his grand children should receive as much less of his estate, as the value of this land at the time he parted with all control over the use and title, and thus finally and irrevocably determined that it should not belong to any of his other heirs.
Land verbally given as an advancement, and sold by the donee with the donor's consent, should be estimated, in hotchpot, at the price for which it was sold.
The statue of 1830 should, in our opinion, be interpreted as meaning that, all advancements should be charged at their value at the time they were made complete and irrevocable, either in law or equity.
We are, therefore, of the opinion that the Circuit Court did not err in estimating the land conveyed to T. T. Barber, at the date of the conveyance, and charging that value to his children in the partition of their grand father’s real estate.
But it appears that some years prior to Taylor’s conveyance to Barber, the latter had, with the consent of the former, sold one hundred and twenty five acres of the land, at only five dollars per acre; and it rather appears that Barber’s heirs are charged by the decree with the value in 1833, of that portion, as well as the residue of the tract, as conveyed to their father.
This was not right. As the sale was made with Taylor’s authority, when Barber had no title to the land, the price for which it was sold, should be considered as so much money advanced by Taylor; and Barber’s heirs should be charged only with that money, and not with the present value of the land for which the money was given.
For this last error alone, the decree is reversed, and the cause remanded.